**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| NLG, LLC, | Case No. 21-11269 (JKS) |
| Debtor. | (Involuntary) |

| | |
|---|---|
| ALFRED T. GIULIANO, the Chapter 7 Trustee for the estate of NLG, LLC,<br>Plaintiff, | Adv. No. 22-50086 (JKS) |
| v. | |
| Selective Advisors Group LLC and 9197-5904 Quebec, Inc., | |
| Defendants. | |

## NOTICE OF FILING AND REQUEST FOR JUDICIAL NOTICE OF TRANSCRIPT OF HEARING HELD ON OCTOBER 25, 2022 ON TRUSTEE'S MOTION TO APPROVE SETTLEMENT BY AND AMONG ALFRED GIULIANO AND LIZA HAZAN

Please take notice that Liza Hazan, *pro se*, hereby files and hereby requests that the Court

take judicial notice of the following:

1. Transcript of Hearing on Trustee's Motion to Approve Settlement by and among NLG,

   LLC's Trustee Alfred Giuliano and Liza Hazan held on October 25, 2022.

Respectfully submitted,

**LIZA HAZAN**
*Pro Se*

6913 Valencia Drive
Miami Fl 33109
(212) 920 6605
Lizahazan77@gmail.com

FILED

2022 NOV 14  AM 11: 17

US BANKRUPTCY COURT
DISTRICT OF DELAWARE

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| NLG, LLC, | Case No. 21-11269 (JKS) |
| Debtor. | (Involuntary) |
| ALFRED T. GIULIANO, the Chapter 7 Trustee for the estate of NLG, LLC,<br>Plaintiff, | Adv. No. 22-50086 (JKS) |
| v. | |
| Selective Advisors Group LLC and 9197-5904 Quebec, Inc., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 14, 2022 a true and correct copy of the foregoing was overnighted to the Clerk of Court for electronic filing, which will electronically serve a copy of the foregoing document on all parties of record and was emailed directly to counsel of record by Liza Hazan.

**LIZA HAZAN**
*Pro Se*

Liza Hazan
6913 Valencia Drive
Miami Fl 33109
(212) 920 6605

1

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3    IN RE:                    .  Chapter 11
                               .  Case No. 21-11269 (JKS)
4    NLG, LLC,                 .
                               .
5              Debtor.         .
     . . . . . . . . . . . .   .
6                              .
     ALFRED T. GIULIANO, the   .  Adversary Proceeding No.
7    Chapter 7 Trustee for the .  22-50086 (JKS)
     Estate of NLG, LLC           .
8                              .
         Plaintiff,            .
9                              .
         v.                    .
10                             .  Courtroom 6
     SELECTIVE ADVISORS        .  824 Market Street
11   GROUP, LLC                .  Wilmington, Delaware 19801
                               .  Tuesday, October 25, 2022
12        Defendants.          .  10:30 a.m.
     . . . . . . . . . . . .   .
13

14                      TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE J. KATE STICKLES
15                UNITED STATES BANKRUPTCY JUDGE

16   APPEARANCES:

17   For the Trustee:
                          Seth Niederman, Esquire
18                        Jesse Harris, Esquire
                          Michael Menkowitz
19                        FOX ROTHSCHILD, LLP

20   Audio Operator:      Madaline Dungey, ECRO

21   Transcription Company:   Reliable
                          The Nemours Building
22                        1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
23                        Telephone: (302) 654-8080
                          Email:  gmatthews@reliable-co.com
24

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

2

1   APPEARANCES (CONTINUED)

2   Trustee:                    Alfred Giuliano

3   Pro Se:                     Chris Kosachuk

4   Pro Se:                     Juan Ramirez, Jr.

5   Selective Advisors Group:   Sean Meehan

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                                  INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 1:   Motion for an Order Approving Agreement
4            By and Among the Chapter 7 Trustee and
             Liza Hazan
5

6
   WITNESS CALLED:
7
             Alfred T. Giuliano
8            Direct Examination by Mr. Harris          9
             Cross-examination by Mr. Kosachuk        16
9            Cross-Examination By Mr. Ramirez         27
             Redirect Examination by Mr. Harris       35
10

11
   Transcriptionist's Certificate                      67
12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Proceedings commenced at 10:31 a.m.)

2               THE COURTROOM DEPUTY:  All rise.

3               THE COURT:  Good morning, everyone.  For those on

4    Zoom, this is Judge Stickles.  We're on the record in NLG,

5    LLC, Case Number 21-11269, an adversary proceeding 22-50086.

6    I'll turn the podium under the Trustee's counsel

7               MR. HARRIS:  Good morning, Your Honor.  Jesse

8    Harris on behalf of the Chapter 7 Trustee, Alfred Giuliano.

9               THE COURT:  Good morning, Mr. Harris.

10              MR. HARRIS:  Your Honor, we're here today in the

11   Trustee's motion for entry of an order approving the

12   stipulation and settlement agreement resolving the adversary

13   proceeding between the Debtor and Selective Advisors Group,

14   LLC.

15              Your Honor, I'd like to start by providing some

16   background underlying the adversary proceeding and the

17   settlement agreement before the Court.

18              THE COURT:  Yes, please.

19              MR. HARRIS:  Thank you, Your Honor.  Your Honor,

20   prior to the petition date, Christopher Kosachuk informed the

21   Debtor to facilitate the sale of real property located at

22   6913 Valencia Drive, Fisher Island, Florida, to an individual

23   named Liza Hazan.

24              To fund her purchase of the property, Ms. Hazan

25   executed a promissory note in favor of NLG in the original

1 | principal amount of 1.75 million as well as a purchase money
2 | mortgage to secure the debt.
3 |         Shortly after the transaction, however, Ms. Hazan
4 | defaulted under the promissory note for failure to make
5 | payment.
6 |         Your Honor, what started as a simple foreclosure
7 | action eventually spiraled into extensive multijurisdictional
8 | litigation spanning over more than a decade.  According to
9 | NLG's prepetition filings, this spiraling was triggered by
10 | Hazan obtaining allegedly fraudulent judgments to set off the
11 | amounts owed to NLG while the foreclosure proceedings were
12 | pending.
13 |         In other words, NLG alleged that Hazan sought to
14 | wipe out the mortgage before NLG could foreclose on the
15 | property, and Hazan managed to accomplish this goal,
16 | according to NLG, which ultimately precipitated NLG's
17 | bankruptcy case.
18 |         Your Honor, since his appointment, the Trustee and
19 | his professionals have worked very hard to understand the
20 | nature of the prepetition litigation, including the
21 | underlying facts and complex procedural posture.
22 |         To this end, the Trustee and his professionals
23 | have reviewed hundreds of records and filings and have had
24 | several conversations with various interested parties,
25 | including Kosachuk, counsel for Hazan, Hazan, and counsel for

1   the related shell companies.

2           As a result of this investigation, the Trustee

3   believes that certain documents underlying the pre-petition

4   transactions raise legitimate questions about the conduct of

5   Hazan and related parties.

6           That said, the Trustee also believes that over the

7   course of more than 12 years, various courts around the

8   country have already addressed these questions in a way that

9   almost certainly forecloses any further action by the

10  Trustee.

11          And for this reason, the Trustee believes that

12  resolving the potential claims against the subject parties

13  under the agreement is a sound exercise of the Trustee's

14  business judgment and represents the best possible result for

15  the Debtor's creditors.

16          Your Honor, moving to the terms of the agreement,

17  the pertinent provisions are as follows:  First, there'll be

18  a settlement payment of $225,000 from Ms. Hazan to the

19  Trustee, which has to be made within a year and is payable

20  upon the sale or refinancing of the property.

21          The agreement will also be recorded as a lien on

22  the property to secure payment.  And in consideration of

23  these terms, the agreement includes broad releases for

24  Selective, Hazan, and certain affiliated parties which will

25  end this adversary proceeding as well as other proceedings

1  pending as of the petition date.

2          Your Honor, to achieve this favorable result, the

3  parties conducted extensive arms-length negotiations where

4  both sides fought hard for their positions.  Indeed, this was

5  far from an easy negotiation, and it's also worth noting that

6  Ms. Hazan is particularly motivated to make the payment in

7  this case because the consummation of her own confirmed

8  Chapter 11 plan in Florida is largely contingent upon Ms.

9  Hazan refinancing or selling the property.

10          Your Honor, turning to the merits, the Court

11  should approve the agreement because it is supported by sound

12  business justifications, the agreement is more than

13  reasonable, and the four Martin factors warrant approval.

14          As Your Honor is aware, under the Martin standard,

15  when deciding whether a settlement should be approved, the

16  Court should "assess and balance the value of the claim that

17  is being compromised against the value to the estate of the

18  acceptance of the compromised proposal."

19          And to this end, the Court should consider four

20  factors.  One, the probability of success in litigation; two,

21  the likely difficulties in collection; three, the complexity

22  of the litigation involved and the expense and convenience

23  and delay necessarily attending it; and four, the paramount

24  interest of the creditors.

25          Your Honor, Mr. Giuliano is here today and

8

1  available to testify.  However, in the interest of time, if

2  acceptable to the Court, I can provide an offer of proof of

3  his testimony.

4           THE COURT:  Let me ask, does anyone oppose a

5  proffer of Mr. Giuliano's testimony?

6           MR. KOSACHUK:  I do, Your Honor.  I'd like to hear

7  Mr. Giuliano testify himself.

8           THE COURT:  Okay.

9           MR. HARRIS:  That's fine, Your Honor.  I'd like to

10  call the Trustee up to the stand, Your Honor.

11           THE COURT:  Okay.  Please.  Before Mr. Giuliano

12  testifies, could we take a two-minute break?

13           MR. HARRIS:  Sure, Your Honor, of course.

14           (Off the record at 10:37 a.m.)

15           (On the record at 10:38 a.m.)

16           THE COURT:  Please be seated.  My apologies.

17           MR. HARRIS:  No worries at all, Your Honor.

18           THE COURT:  The temperature is warm in here.

19  Could you please swear in the witness?

20           THE CLERK:  Please raise your right hand.  Do you

21  affirm that you will tell the truth, the whole truth, and

22  nothing but the truth to the best of your knowledge and

23  ability?

24           THE WITNESS:  I do.

25           THE CLERK:  Please state your full name and spell

9

1  your last name for the record..

2           THE WITNESS:  Alfred T. Giuliano, G-I-U-L-I-A-N-O.

3           THE CLERK:  Thank you.

4           MR. HARRIS:  May I proceed, Your Honor?

5           THE COURT:  Yes, please.

6           MR. HARRIS:  Thank you.

7  DIRECT EXAMINATION BY MR. HARRIS:

8      Q.   Okay.  Mr. Giuliano, can you please tell the Court

9  in what capacity you're involved in this case?

10     A.   Yeah, I'm serving as the Chapter 7 bankruptcy

11 trustee.

12     Q.   Okay.  And how long have you been a trustee for?

13     A.   Since 2002.

14     Q.   And can you tell the Court how many cases you've

15 administered?

16     A.   Well over 1,000.

17     Q.   Okay.  Can you please describe to the Court the

18 background of the Debtor's bankruptcy case?

19     A.   Yeah.  This all originates out of a mortgage that

20 was from the sale of 9613 Valencia Avenue in Florida --

21 Miami, Florida.  And it started out as a 1.275 mortgage.  Ms.

22 Hazan defaulted on the mortgage.  There were efforts made to

23 get the mortgage reinstated.  I believe there were

24 settlements along the way.

25           And ultimately, there was litigation that ensued

1  with respect to confession of judgment and voiding that, et

2  cetera.  And so the status right now is the -- all that

3  litigation is basically been resolved with respect to Second

4  Circuit Court of Appeals and the Seventh District of New

5  York.

6      Q.   Great.  Okay.  Can you tell the Court what the

7  present status is of the bankruptcy case?

8      A.   I'm serving as the Chapter 7 bankruptcy trustee.

9  At this point in time, I'm liquidating what little assets

10 there are, and then we'll examine claims and file a final

11 report.

12     Q.   Okay.  And are there any other possible assets

13 other than these potential claims?

14     A.   Not meaningful assets, no.

15     Q.   Okay.  I want to talk about these claims for a

16 moment.  Are you aware of the pre-petition fraud allegations

17 made by NLG against Selective?

18     A.   Yes.

19     Q.   Okay.  And are you aware that it stems from the

20 sale of the property by the Debtor to Ms. Hazan?

21     A.   Yes, I do.

22     Q.   Okay.  Are you aware that NLG was granted a

23 mortgage on the property in conjunction with that sale?

24     A.   Yes, I am.

25     Q.   Okay.  Are you aware that Ms. Hazan defaulted

1  under the mortgage prior to the petition date?

2      A.   She did, yes.

3      Q.   Are you aware that NLG pursued legal action

4  against Ms. Hazan for those defaults?

5      A.   Yes, I am.

6      Q.   Are you aware that while those proceedings were

7  ongoing, the mortgage was satisfied by Selective, executing

8  on a separate confession of judgment held by Selective?

9      A.   I am.

10     Q.   Okay.  Are you aware of NLG's prepetition

11  challenges to that setoff?

12     A.   Yes.

13     Q.   Are you aware that NLG was subject to various

14  adverse orders in connection with those challenges?

15     A.   I am, yes.

16     Q.   Okay.  Are you aware that those adverse orders

17  include orders from a New York State court, a New York

18  Federal court, the Second Circuit, a bankruptcy court in

19  Florida, a district court in Florida, and the 11th Circuit?

20     A.   A lot of courts, yes.

21     Q.   A lot of courts.  Okay.  Moving on, can you

22  describe the negotiations that took place with the Defendants

23  following commencement of the adversary proceeding?

24     A.   Yeah.  There was very diligent settlement

25  discussions between my counsel, me, and Ms. Hazan and her

1   counsel.

2        Q.    Thank you.

3        A.    It was, you know, encompassed in several emails,

4   phone conversations, et cetera.

5        Q.    And what was the Defendant's general position with

6   respect to these allegations?

7        A.    That they were -- they objected to them.

8        Q.    And did they point to those various court orders?

9        A.    Yeah, some of them, yes.

10        Q.    Okay.  Can you describe the proposed settlement,

11   as you understand it, in broad strokes?

12        A.    There will be eventually a payment of $225,000

13   from Ms. Hazan.  There will be a mortgage or lien, I should

14   say, attached to the Valencia property.  There will be a

15   release of liens and -- or I'm sorry, release of -- general

16   releases to the Trustee and his professionals and to Ms.

17   Hazan and her related companies and professionals.

18        Q.    Okay.  Was the agreement a result of good-faith,

19   arms-length negotiations, free of any collusion?

20        A.    Absolutely.

21        Q.    Okay.  Did you consider the case of In re Martin

22   in your analysis?

23        A.    I did.

24        Q.    All right.  Let's go through those factors one by

25   one.  First, can you tell us what the -- your assessment was

13

1   in terms of the probability of success in litigation?

2        A.   Very slim, if any at all.  This case has been, you

3   know, back and forth.  Very recently, there were decisions

4   from the Southern District of New York in the Second Circuit,

5   the Eleventh Circuit, and I think the complexity of it is --

6   and the probability is very remote.

7        Q.   Okay.  And you consulted your counsel --

8        A.   I did.

9        Q.   -- with connect -- in connection with that

10  analysis?

11       A.   Your firm as well as special counsel, potential

12  special counsel.

13       Q.   Okay.  Are you aware of some of the court orders

14  that suggest or find that the claims were untimely?

15       A.   I am.

16       Q.   Okay.  And was that a factor in your analysis?

17       A.   Sure, yes.

18       Q.   Okay.  And what about your assessment of the

19  difficulties in collection?

20       A.   The money's going to have to come out of the sale

21  of the property or refinance.  It does not appear that Ms.

22  Hazan has the money to pay it, and therefore, we negotiated a

23  lien against her property, and she's coming out of her own

24  bankruptcy, so you know, collection is an issue.

25       Q.   So even if we did prevail, you believe that

14

1   collection would be an issue?

2        A.   Potentially, yes.  She has to sell the house

3   and -- or refinance it.

4        Q.   Does the fact that Ms. Hazan's Chapter 11 plan

5   include injunction provisions and releases and directives not

6   to pursue claims against her or her property have any impact

7   on your analysis?

8        A.   It does, sure, certainly.

9        Q.   Are you aware that other liens have been placed on

10  the property since the time Judge Crystal and her bankruptcy

11  case made the decision?

12       A.   I'm not sure when they were filed, but I know

13  there's multiple liens against the property, including one at

14  Chase, another one to related party of Ms. Hazan, IRS, NLG,

15  if this motion gets approved.

16       Q.   Okay.  Moving on.  What about your assessment of

17  the complexity of the litigation including the expense and

18  convenience and delay necessarily attending it?

19       A.   Very complex.  It's -- to under the -- to under it

20  at this point in time, it's -- I've never done it, and I

21  think it'd be very, very, very difficult.

22       Q.   Okay.  So in terms of complexity, you're aware

23  that this --

24       A.   Yes.

25       Q.   -- has been going on for over 12 years now?

15

1       A.    Twelve years.   That's correct.

2       Q.    Okay.   And in numerous jurisdictions?

3       A.    Correct.   Pennsylvania, Delaware, Florida, New

4   York.

5       Q.    Okay.   And would you agree that it would be very

6   expensive to pursue this litigation to completion?

7       A.    It would.   And I have no money in the estate to

8   hire counsel, for the counsel to engage professionals, to

9   even file a filing fee.   There's no money in this case.

10      Q.    And in terms of the delay, does the fact that this

11  has been going on for 12 years before this bankruptcy case

12  have any impact on your analysis?

13      A.    Well, in -- in -- it's impacted it because of the

14  complexity, certainly.   And the likelihood of pursuit of

15  the -- you know, prevailing

16      Q.    And the possibility of any appeals, was that a

17  factor in your decision?

18      A.    It was a minor factory, yes.

19      Q.    Okay.   Okay.   Moving on to the last factor, what

20  about your assessment of the interests of the Creditors?

21      A.    It's -- this is the only deal that's out there.

22  If this deal does not get approved, then I -- you know,

23  there's no money to pay professionals, to pay attorneys, so

24  it will either end up as a no-asset case, or it may be Mr.

25  Kosachuk might want to, you know, overbid.   I mean, that's

16

1   always an option.  That's one of the reasons why we're here

2   today to see if there's any interest in it.

3        Q.   Great.  So to conclude, in your business judgment,

4   do you believe that entry of the agreement is in the best

5   interest of the estate and all of the Creditors?

6        A.   Absolutely, yes, I do.

7             MR. HARRIS:  Your Honor, I have no further

8   questions.

9             THE COURT:  Thank you.  Cross-examination?

10            MR. KOSACHUK:  Can I -- should I go to the podium

11  or from the table?

12            THE COURT:  From -- from the podium, please.

13            MR. KOSACHUK:  No problem, Your Honor.

14  CROSS-EXAMINATION BY MR. KOSACHUK:

15       Q.   Good morning, Mr. Giuliano.

16       A.   Good morning, sir.

17       Q.   I guess you mentioned in your testimony that

18  you've administered over 1,000 cases.  Have any of these

19  assets been in Florida?

20       A.   I have.  I'm sure there were.  I'd have to think

21  through it.  As I sit here right now, I -- I don't recall any

22  in Florida.

23       Q.   Okay.  Do you have any understanding of Florida

24  law and the Florida Homestead Exemption?

25  A.   I have a general understanding of the Florida Homestead

17

 1  Exemption.

 2        Q.   And are you aware that the lien you've proposed is

 3  unenforceable?

 4        A.   I think the lien attaches, and it would -- it

 5  would stick in the event of a sale or in the event of a

 6  refinance.

 7        Q.   Are you aware what position your potential lien

 8  would be?

 9        A.   I believe it's behind at least two -- I think it's

10  behind the IRS; it's behind Chase.  And I think there's

11  another $2 million lien out there, but I believe that's

12  subordinated.  So I think that would come behind the $225,000

13  lien.

14        Q.   Okay.  So -- so let's go over this.  Are you aware

15  that NLG has a final judgment of foreclosure on this same

16  property?  On the 6913 Valencia Drive, Fisher Island, Florida

17  property?

18        A.   Am I aware what?

19        Q.   Are you aware that NLG has a recorded final

20  judgment of foreclosure in the amount of $4,876,634.54

21  against the subject property at issue that you are proposing

22  to release all claims against?

23        A.   I am not aware of that.

24        Q.   You're not?

25        A.   I don't believe so.

1          Q.    Okay.  Thank you.

2          A.    I'd have to discuss it with Counsel.

3          Q.    Okay.  Are you aware of a -- of pending litigation

4    with JP Morgan Chase Bank another foreclosure against Ms.

5    Hazan?

6          A.    That I'm aware of, yes.

7          Q.    Okay.  Are you -- do you happen to know the

8    approximate amount that's due to JP Morgan Chase Bank?

9          A.    I believe at the time of the -- of the -- of -- of

10   the plan -- her plan, it was about $3.8 million.

11         Q.    Are you current -- do you realize today that's

12   it's currently 7 million?

13         A.    I don't know what it is today.  I know at that

14   point in time it was 3.8 million.

15         Q.    Okay.  Are you aware that there's a Creditor out

16   there named 6913 Valencia LLC who, also, holds an approximate

17   $5 million mortgage against this same subject property?

18         A.    I -- I'm aware that they're out there, but they

19   would release that lien as part of this deal.

20         Q.    They would release or have released?

21         A.    They would release.

22         Q.    Okay.  Are -- are you aware that 6913 Valencia

23   Drive is Ms. Hazan?

24         A.    I know it's related to her.

25         Q.    Okay.  Are you aware, also, that the IRS has a

19

1  lien on the same property for over $500,000?

2        A.    I'm aware that they have a lien, yes.

3        Q.    Okay.  Are -- are you aware that Ms. Hazan has not

4  paid her income taxes since 2002, which is the cause of the

5  $500,000 lien against the Fisher Island property?

6        A.    I'm not aware of that, no.

7        Q.    Are you aware that the IRS has recorded liens in

8  Miami-Dade County against the subject property?

9        A.    Yes, I am.

10       Q.    Okay.  So you do know about those?

11       A.    I do.

12       Q.    Okay.  Are you aware of the Valencia Estate's

13 Homeowner's Association pending foreclosure against the same

14 property?

15       A.    I am.

16       Q.    And are -- do you know how much is due to the

17 Valencia Estate's Homeowner's Association?

18       A.    I think it's been paid down a little bit, but

19 it's -- I'm going to say in a range of 100 to 200,000.

20       Q.    Are you aware of the Fisher Island Community

21 Association lien against the property?

22       A.    I am.

23       Q.    And do you know how much, approximately, is owed

24 to the Fisher Island Community Association?

25       A.    My understanding it's in that same range.

1    Q.    In the same range of 100,000?

2    A.    Of 150,000.

3    Q.    Would it surprise you if I told you that it's,

4 actually, 800,000?

5    A.    I'm not aware of that.

6    Q.    Okay.  So now we're going through this.  We've

7 got -- right now as it stands, you're unaware of NLG's final

8 judgment of foreclosure on the -- on the subject property,

9 which is, arguably, in first position.  We've now got another

10 mortgage to JP Morgan Chase Bank for $7 million.  We've got

11 IRS for 500,000; we've got Fisher Island for 800,000; we've

12 got Valencia for 100,000; we've got Hazan to herself through

13 a shell company set up by her mother for 5 million more.  And

14 what you're proposing now is to trade -- do you know how --

15 sorry.

16         THE COURT:  Mr. -- Mr. Kosachuk, could you --

17 you're not making argument.  You're asking --

18         MR. KOSACHUK:  Oh.

19         THE COURT:  -- questions.

20         MR. KOSACHUK:  I apologize.  I'm just trying to

21 get an understanding if Mr. Giuliano understands the capital

22 structure of the property and how much, for instance, is --

23 he, obviously, doesn't know anything about what's owed to NLG

24 because he's just --

25         THE COURT:  Mr. Kosachuk, you're -- you're in

1  cross-examination.  You ask the witness questions.

2  BY MR. KOSACHUK:

3      Q.   Do you know how much is owed to NLG, pursuant to

4  the final judgment of foreclosure right now that I mentioned

5  to you earlier?

6      A.   Did I before today?  No.

7      Q.   I'm sorry?

8      A.   Did I -- before today?  No.

9      Q.   Okay.

10     A.   No.

11     Q.   Are -- are you aware of a -- of an action by

12 counsel -- Attorney Juan Ramirez who's on the Zoom call, as

13 well, challenging this judgment by confession in New York?

14     A.   I became aware of it, yes.

15     Q.   And you're aware that it's pending currently?

16     A.   Yeah, I've discussed with my Counsel, and they

17 don't feel that it has really any -- any merit.

18     Q.   Are you aware of a court order entered in that

19 same case?

20     A.   It's my understanding it's being appealed.

21     Q.   And it's subject to a pending -- a current appeal

22 right now that's to be heard in November, next month?

23     A.   I don't know when it's scheduled, but.

24     Q.   Okay.  From the proposed $225,000, how much will

25 the Creditors actually receive?

1      A.    225,000.

2      Q.    The whole amount?

3      A.    Correct.

4      Q.    Okay.

5      A.    And Creditors includes all Creditors, Chapter 7

6  administrative Creditors and priority Creditors, unsecured

7  Creditors.  That was the question you asked me.

8      Q.    Okay.  Of the Creditors that have filed a proof of

9  claim, approximately how much will those Creditors receive?

10     A.    It's too early to determine.

11     Q.    Are you aware that I made an offer to purchase

12  these claims?

13     A.    For $1,800, yes.

14     Q.    Are you aware that I made you previous offer back

15  in June?

16     A.    No, I'm only aware of the offer for $1,800.

17     Q.    To settle the two claims, correct?

18     A.    To, basically, buy out the position of Ms. Hazan

19  in this -- for this motion.

20     Q.    Okay.  Is Ms. Hazan a party to the adversary

21  that's pending here before this Court?

22     A.    I don't believe so.  I believe it's Selective,

23  which is a related company.

24     Q.    And are you aware of who the Plaintiff is?

25     A.    The Plaintiff is -- is NLG.

1       Q.    And it's against Selective Advisors?

2       A.    Correct.

3       Q.    Are you aware Ms. Hazan and her husband, Mr.

4   Meehan, are now divorced?

5       A.    No, I'm not aware.

6       Q.    Have you ever spoken to Mr. Meehan?

7       A.    I have not.

8       Q.    Have you spoken to Ms. Hazan?

9       A.    I have not.  My attorney has, through her

10  attorney.

11      Q.    You mentioned some difficulties in collection as

12  one of the primary factors as to why this settlement is in

13  the interest of the Creditors.  What makes you believe that

14  you would have any different result with Ms. Hazan?

15      A.    I mean, it's -- it's going to play out.  I mean,

16  I'm going to have a lien on the property, and she has to

17  either refinance it or sell it.

18      Q.    And what happens when she does neither?

19      A.    Then at that point in time, I'd move for judgment.

20      Q.    A money judgment?

21      A.    A money judgment, yes.

22      Q.    Right.  Okay.  Which gets back to my -- are you

23  aware that a money judgment against Ms. Hazan is

24  unenforceable against her Florida homestead?

25      A.    Again, you know, when she either sells the -- I

24

1 │ may not be able to foreclose on it, but when she sells the

2 │ property or refinances the property, at that point in time,

3 │ money would be forthcoming to the estate.

4 │     Q.   Okay.  So I want to make sure I'm clear in

5 │ understanding this.  You're proposing trading NLG's security

6 │ insurance, which is at first position at this point, for over

7 │ $9 and a half million for a promised-to-be-paid 225,000 --

8 │          MR. HARRIS:  Objection, Your Honor.  He's

9 │ testifying.

10 │         MR. KOSACHUK:  --- in a year?  I'm just making

11 │ sure, Your Honor, that I understand --

12 │         MR. HARRIS:  It's not a question.  He's

13 │ testifying.

14 │         MR. KOSACHUK:  -- what's happening.

15 │         THE COURT:  Well --

16 │         MR. KOSACHUK:  I --

17 │         THE COURT:  You -- you can ask him, but I would

18 │ like you, for purposes of this record, to reference the

19 │ judgment that you're speaking about where that judgment is

20 │ recorded.

21 │         MR. KOSACHUK:  Yes, Your Honor.  I can do that.

22 │         THE COURT:  Because this -- there -- Mr. Kosachuk,

23 │ there's a very long record in this case, and I want to ensure

24 │ I understand your question about this judgment you're

25 │ referring to, where that judgment is.

1       MR. KOSACHUK:  Hold on a second, Your Honor.

2       Okay.  The final foreclosure of judgment that I'm

3  referring to is entered in the matter of NLG, LLC, versus

4  Elizabeth Hazan, Unknown Spouse, JPMorgan Chase Bank, 6913

5  Valencia, Fisher Island Community Association, Valencia

6  Estate's Homeowner's Associations, Jane and John Doe, and

7  Tenants of the Subject Property.

8       The case number's 2011-42770CAO1.  The final

9  judgment of foreclosure is recorded in the official record

10  books of Miami-Dade County with central file number

11  20150812181, Book 29902, Page 3737.  The exact amount of the

12  final judgment of foreclosure is $4,876,654.29.  This final

13  judgment of foreclosure is an in-rem judgment against all

14  Defendants.

15       This judgment is accruing $1,063, I believe, per

16  diem interest, and I believe this is of record in the

17  adversary proceeding, Your Honor.  And I'll get you an exact

18  document number.

19       I can give you the citation from the original --

20  because the case was transferred -- this adversary was

21  transferred from the Southern District of Florida, and the

22  final judgment of foreclosure that I'm referring to is

23  recorded on the docket in the original case, but when it got

24  transferred up here, that whole docket doesn't get recorded

25  automatically.

1          Are you following me on that?

2          THE COURT:  Understood.

3          MR. KOSACHUK:  Okay.  So give me a second, and

4   I'll see if I can get it for you from Florida.

5          All right.  I apologize, Your Honor, for -- I'd be

6   happy to provide to the Court.  It is of record.  I've given

7   the accurate citation to it.

8          MR. RAMIREZ:  Hold on.  Judge, can you hear me?

9          THE COURT:  I can.  Please identify yourself.

10          MR. RAMIREZ:  Yes, I'm -- I'm Ramirez, Jr.,

11   from -- I'm, unfortunately, standing on an airport because

12   I'm traveling from Nashville to Miami, but I'm -- I'm going

13   to have a couple of questions for the Trustee.  I don't know

14   if you've made time for that, but I have a judgment -- part

15   of the judgment that Mr. Kosachuk's referring to awarded me

16   fees and have been accruing fees after that that exceed a

17   million dollars.  So I have an interest in this litigation,

18   of course, and this settlement.

19          THE COURT:  Okay.  Well, we're in the midst of

20   cross-examination, Mr. Ramirez.  You will get your turn.

21          MR. KOSACHUK:  I'll -- I'll --

22          MR. RAMIREZ:  Okay.  Thank you.

23          MR. KOSACHUK:  I will allow him to proceed, and

24   I'll step down, Your Honor.

25          THE COURT:  Okay.  Let me state for the record

1  that this Court does not, generally, permit witnesses to

2  cross-exam -- I mean, excuse me -- parties to cross-examine

3  or direct examine witnesses by video.  I will allow it under

4  the circumstances, but let me be clear going forward.  That

5  is not the policy of the Court to allow cross-examination at

6  these hybrid hearings.  You may proceed --

7            MR. RAMIREZ:  Thank you, Judge.

8            THE COURT:  -- Mr. Ramirez.

9            MR. RAMIREZ:  (Inaudible).

10  CROSS-EXAMINATION BY MR. RAMIREZ:

11      Q.   I would like to know, if you could describe for

12  the Court, the nature of the fraud that you alluded to by Ms.

13  Hazan.

14      A.   My understanding of the recording of a -- a

15  confession of judgment.  There was a confession of judgment

16  that was, I guess, prepared or submitted or -- by Quebec and

17  eventually transferred over to Selective.

18      Q.   All right.  Do you know who signed the affidavit

19  professing to the judgment?

20      A.   No, I don't, not as I sit here today.

21      Q.   Do you realize that it was the Plaintiff --

22  President of the Plaintiff Corporation that recorded or

23  signed the affidavit?

24      A.   If you say so.

25      Q.   And do you -- are you aware that that would be a

1   fraudulent judgment but it's, also, a judgment without any

2   jurisdiction?

3          A.   I -- I'm aware of the --

4               MR. HARRIS:  Objection, Your Honor.  That requires

5   a legal opinion.

6               THE COURT:  Yes, I will sustain the objection.

7   BY MR. RAMIREZ:

8          Q.   Well, has Counsel advised you on the likelihood of

9   that judgment being upheld by any court, given those facts

10  that we have just discussed?

11         A.   I'm sorry.  Can you repeat that?

12         Q.   I'm -- I wanted to know what advice have you been

13  given regarding the validity of that --

14              MR. HARRIS:  Objection, Your Honor.  That's a --

15  obviously, attacks attorney/client privilege.

16              THE COURT:  Sustained.

17  BY MR. RAMIREZ:

18         Q.   Do you know -- you said you don't know -- never

19  contacted Mr. Meehan.  Do you know that he was the owner of

20  Selective Advisors?

21              THE COURT:  Mr. Ramirez -- excuse me, Mr. Ramirez,

22  I cannot hear you.  There is noise behind you.

23              MR. RAMIREZ:  Yes, I'm at an airport, Judge.

24  (Inaudible) --

25              THE COURT:  I understand that.  But I can't have

1   you compete with an announcement in an airport.  Okay.  It's

2   quiet.

3           MR. RAMIREZ:  Okay.

4           THE COURT:  You may proceed.

5   BY MR. RAMIREZ:

6       Q.   Are you aware that Mr. Meehan is the owner of

7   Selective Advisors?

8       A.   It's my understanding, yes.

9       Q.   And you have never talked to Mr. Meehan?

10      A.   I have not.  No, I haven't.

11      Q.   Do you know if these lawyers represent Hazan or

12  Mr. Meehan?

13      A.   It's my understanding that -- say that again.

14      Q.   The lawyer you have been negotiating with, do they

15  represent Mr. Meehan?

16      A.   I'd have to ask my attorney.  I'm -- it's my

17  understanding that the lawyers we've talking to represent Ms.

18  Hazan.

19      Q.   But she does not own Selective Advisors.

20      A.   No, she's representing --

21      Q.   Do you know that?

22      A.   -- by Ms. Klein (phonetic) is my understanding.

23  They are -- Selective is.

24          MR. HARRIS:  Objection.  What -- what relevance

25  does this have to the merits of the standard here?  I'm --

1  I'm really struggling with this line of questioning,

2  who represents who.

3            THE COURT:  It -- well --

4            MR. RAMIREZ:  Well, Judge -- Judge, they've

5  reached an agreement, apparently, with Hazan, but she's not

6  the party of interest.  It's Selective Advisors that is the

7  one that holds this judgment that we've been litigating

8  against.  So if he's never talked to Mr. Meehan and doesn't

9  know if any of these lawyers represent Mr. Meehan and Mr.

10 Meehan and Ms. Hazan have recently divorced, I'm just

11 wondering if any of this would be approved by Mr. Meehan if

12 he were to be contacted.

13           MR. HARRIS:  Your Honor, as we explained, Ms.

14 Hazan is intertwined with -- with these various entities, and

15 this is a global resolution.  And there's absolutely no law

16 or rule against a global resolution that incorporates other

17 parties that are part of a settlement agreement.  So I --

18 again, I'm objecting on the ground of relevance.

19           MR. RAMIREZ:  Well, has Mr. Meehan been notified

20 of this hearing?

21           MR. HARRIS:  Mr. Meehan is represented by counsel

22 of record on the docket, and she has received notice, and it

23 has been -- and I have been in touch with her.  So yes.

24 BY MR. RAMIREZ:

25      Q.   Now -- you say you're not aware of a final

1  judgment in Florida (inaudible) NLG.  Are you aware that

2  three or four days before that, the judge entered an order

3  granting foreclosure?

4           MR. HARRIS:  Your Honor, asked and answered.

5           MR. RAMIREZ:  No, I'm talking about a different

6  order.

7           THE COURT:  I'm -- I'm going to ask Mr. Ramirez to

8  repeat the question because I'm not sure what -- what he's

9  speaking to.  I need you to identify with more specificity.

10          MR. RAMIREZ:  All right.

11 BY MR. RAMIREZ:

12     Q.   On December 1st, 2015, are you aware that the same

13 judge that entered the final judgment of foreclosure, also

14 entered an order granting foreclosure in which she speaks at

15 length about this judgment in New York?

16     A.   I'm aware that certain judgments were entered

17 into, but I'm also aware that in the end it came down to the

18 Southern District of New York, the Second Circuit --

19     Q.   That's not -- that's not -- that's not my

20 question.

21     A.   That's my answer.

22     Q.   Well, it's not responsive.  And you -- are you

23 aware of that order granted foreclosure, refused to enforce

24 (inaudible) judgment on the (inaudible) faith and credit

25 because there was no jurisdiction to enter that judgment?

1  Are you aware of that?

2       A.    And again, I'm aware that in the end, there was --

3  there was a decision made by the Second Circuit, the Eleventh

4  Circuit, Court of Appeals, and the New York Southern District

5  of New York that were all unfavorable to an OG.

6       Q.    Okay.  Now, can you answer my question?

7       A.    That's what -- that's my answer.

8       Q.    So you don't know anything about -- order.  You

9  don't know -- know that a judge in Florida, state court

10 judge, that entered the foreclosure, found that the New York

11 judgment was not entitled to full faith and credit because

12 the Court lacked jurisdiction.  Are you aware of that?  Yes

13 or no.

14          THE COURT:  Mr. Ramirez, there -- everyone is

15 aware this case has a lot of different pieces of litigation.

16 Could you be more specific what you're referring to?

17          MR. RAMIREZ:  Yes, I said it was December 1st,

18 2015, order granting foreclosure by Judge Monica Gordo, the

19 State Court of Florida in which she --

20          MR. KOSACHUK:  Your Honor, if I may just help out

21 because I was able to locate the exact docket number for what

22 Mr. Ramirez is referring to.  This is -- it's Document Number

23 161 from the original docket which is Case 18-CV21398JEM.

24 And we are referring to Page 79 of this document.  And it is

25 called the -- the order is called Order granting foreclosure.

1  And this is an exhibit to -- Mr. Ramirez, if you could mute.

2  It's an exhibit to the amended complaint, it was filed and is

3  now pending before this court.  The final judgment of

4  foreclosure, that I was speaking about, is --

5          THE COURT:  Mr. Kosachuk, please, it would help if

6  only one person examined it at a time.

7          MR. KOSACHUK:  Sure.

8          THE COURT:  So Mr. Ramirez, I understand you're

9  referring to December 1, 2015, decision by Judge Gordo.

10          MR. RAMIREZ:  Yes, Judge.

11          THE COURT:  Okay.  And I believe that the Trustee

12  has answered your question.

13          MR. RAMIREZ:  Well, Judge, I -- I'm not sure I

14  know what the answer is.  He's not aware of the final

15  judgment.  Is he aware of the order granted foreclosure?

16      A.   Again, I'm aware of -- when I went back and

17  consulted with my counsel, we, you know, went back, and

18  reviewed as much as could in this case.  There's so many

19  legal filings and decisions and so forth.  It's my

20  understanding that that order was overturned by the

21  judge -- Judge Crystal and again, I'm -- I'm going to revert

22  back to -- we also had this -- the Eleventh Circuit, the

23  Second Circuit, and the Southern District Court of Appeals,

24  that all came -- so yeah, maybe there was a judgment out

25  there a one point in time, but it's my understanding that

1  has -- had been addressed later.

2          MR. RAMIREZ:  Judge, just because I'm here at the

3  airport, and I don't know how longer I can have connectivity.

4  I just want to state, if I could, out of order, that I object

5  to the settlement and that -- I don't know because they

6  haven't answered the question, how much I'm able to get from

7  this settlement because Mr. -- I know Florida law, and I know

8  in the Florida law lien, we just give you a judgment and we

9  would have no ability to go against the property, where now,

10 we do have -- they could reinstate the mortgage; we would

11 have a lien and we would have --

12          THE COURT:  Mr. Ramirez --

13          MR. RAMIREZ:  -- (inaudible) --

14          THE COURT:  -- Mr. Ramirez, we are in the middle

15 of cross-examination.  I will take closing arguments when we

16 get to that point.  But for now we're in the middle of

17 examination.  So unless you have --

18          MR. RAMIREZ:  I understand.

19          THE COURT:  Okay.  Unless you have any further

20 questions, I'm going to turn the podium back to over the

21 Trustee's counsel for redirect.

22          MR. RAMIREZ:  Okay.  But I just want to say that

23 because I may be boarding the plane in a few minutes.  And I

24 may not get a chance to say it again.  Thank you.

25          THE COURT:  I understand.  I've seen your

35

1    pleading.  Thank you.

2    REDIRECT EXAMINATION BY MR. HARRIS:

3         Q.   All right.  Let's talk about the judgment of

4    foreclosure for a second.  Does the Gordo judgment ring a

5    bell?

6         A.   It does, yes.

7         Q.   Okay.  Are you aware that that Gordo judgment was

8    in front Judge Crystal when he made his decision with respect

9    to the alleged lien that NLG held against the property?

10        A.   I am.

11        Q.   Okay.

12        A.   That's what I was saying -- trying to say.

13        Q.   And are you aware that on November 1st, 2017,

14   Judge Crystal entered a judgment on Counts 1, 2, and 3 of a

15   complaint attempting to determine the status of this lien

16   where he said, quote, this Court concludes that NLG has no

17   further rights to any claims against debtor with respect to

18   the note and mortgage as the public records of Miami Dade

19   County reflect that the (inaudible) judgment and the

20   consequently the mortgage were assigned and satisfied and the

21   property fully redeemed prior to the foreclosure sale as

22   provided in the Gordo case as provided in the Gordo

23   foreclosure sale as provided in the Gordo foreclosure

24   judgment.  NLG's proof of Claim Number 17, having been filed

25   after the bar date is disallowed, and the Court finds that

36

1   NLG has no standing in this case based upon the note, claim,

2   or lien emanating there from.

3        A.   I remember going through that with you.  Yes.

4        Q.   Okay.  And are you aware of any foreclosures on

5   the property?

6        A.   At the present, I believe that maybe Chase is

7   foreclosing.

8        Q.   Let me rephrase.  Any foreclosures by NLG prior to

9   the petition date?

10       A.   I'm not aware of any.

11       Q.   Okay.  And despite there not being any foreclosure

12  action and despite the questioning suggesting that there may

13  be, would it surprise you then that if you had a right to

14  foreclosed that the same individual making those arguments

15  would put the entity into an involuntary bankruptcy case?

16       A.   Yeah, that's -- I don't understand that -- why

17  they would do that.

18       Q.   Are you aware that Judge Crystal's decision was

19  upheld on appeal?

20       A.   I am, yes.

21       Q.   Are you aware that further ligation, including the

22  2nd Circuit that you referenced, found that any of these

23  claims were untimely?

24       A.   Yes.

25       Q.   Are you aware that Mr. Kosachuk is currently being

1  held in contempt in the Florida bankruptcy case for making

2  the same arguments and failing to abide by court order?

3              MR. KOSACHUK:  Your Honor, I'm going to object to

4  anything he's -- trying to introduce from Florida.

5              MR. HARRIS:  It's a matter of public record, Your

6  Honor.

7              MR. KOSACHUK:  He's not counsel of record in

8  Florida.  He has no first-hand knowledge of anything that's

9  actually going on in Florida.  He's not a licensed attorney

10  in Florida.  So I'm going to object to any -- he's -- this

11  whole line of questioning about whether or not I'm held in

12  contempt in Florida.

13              THE COURT:  I'm going to overrule the question as

14  being outside the scope of the direct.

15              MR. HARRIS:  Thank you, Your Honor.  Let me -- let

16  me -- let me say it again.

17  BY MR. HARRIS:

18      Q.   Are you aware that he's being held in contempt

19  currently for violating court order in connection with the

20  same arguments he's making here?

21      A.   We've discussed that, yes.

22      Q.   Are you aware that it's a $100 a day, right now?

23      A.   That's my understanding, yes.

24      Q.   Are you aware that's it's subject to further

25  sanction for failure to continue to abide by court order?

38

1          A.    That's what we discussed, yes.

2          Q.    Are you aware that there is a possibility that a

3    custodian is appointed to -- to oversee the -- Mr. Kosachuk's

4    position in Florida?

5          A.    I heard that, yes.

6          Q.    Okay.  One other question.  Are you aware that

7    the -- the property's up for sale for $20 million?

8          A.    Yes, I -- it was -- I think listed for 25 or 26

9    million, but it's been dropped.

10         Q.    Okay.  And do you feel comfortable based on that

11   amount that there's sufficient equity in the property to

12   cover our $225,000 lien if this is approved?

13         A.    I do.

14              MR. HARRIS:  Thank you, Your Honor.  No further

15   questions.

16              THE COURT:  I may have a few questions.  Can you

17   bear with me a second?

18              MR. RAMIREZ:  Judge, could I ask one more

19   question?  If I may, just --

20   RECROSS-EXAMINATION BY MR. RAMIREZ:

21         Q.    I want to know approximately or (inaudible), how

22   much -- a percentage, would I get on my claim?

23              MR. HARRIS:  Your Honor, that's been asked and

24   answered.  And it also calls for speculation.

25              THE COURT:  Is the answer any different than the

1  question when posed by Mr. Kosachuk?

2          THE WITNESS:  I'm sorry.

3          THE COURT:  Is the answer any different than when

4  the question was posed by Mr. Kosachuk?

5          THE WITNESS:  It is not, Your Honor.

6  BY MR. RAMIREZ:

7      Q.   Well, they -- they -- the answer was how much

8  would he get, and they said (inaudible).  I just want to know

9  an approximate amount.  Is it going to be 2 percent, 10

10  percent, 50 percent, an estimate of how much is going to left

11  over for the creditors after the administrative fees and

12  attorneys fee are paid.

13          THE WITNESS:  You want me to answer that, Your

14  Honor?

15          THE COURT:  Yes.

16          THE WITNESS:  As I indicated earlier, it -- it's

17  too early to say.  It all depends on what happens with the

18  claims that are out there.  Mr. Kosachuk, you know, had

19  fought a claim for $5 million and I have to look at that

20  claim, is it an equity, is it equity, is it -- is he a

21  creditor.  So it depends on that.  If that claim was wiped

22  out, then your claim would -- would have -- would get a

23  larger percentage.  So it just depends.  And it's too early.

24  BY MR. RAMIREZ:

25      Q.   Let me ask you this.  How much would it be total

1  left for the claims as opposed to administrative fees?  How

2  much do you foresee in administrative fees and attorney's

3  fees to be at this point?

4      A.    Well, it all depends on much ligation is involved.

5  But at this point in time, I -- I asked them before we

6  convened today, their fees are roughly $150,000.  The -- I've

7  worked with Fox Rothchild in a number of cases, and they

8  understand the importance of getting out meaningful

9  distribution to creditors.  And they have taken reductions in

10  the past, and they've indicated to me that they would be

11  willing to take a reduction in this case.  But it all

12  depends, again, on -- on the -- what happens with all the

13  claims.

14          THE COURT:  Let me ask you.  With respect to the

15  releases, do you know what types of claim the Hazan releasees

16  are releasing against NLG, and by that, I mean, the parties,

17  other than Hazan.  I'm using the definition within this

18  settlement agreement

19          THE WITNESS:  It's my understanding, Your Honor,

20  that it's -- I think, you know, she wants to be done with

21  everything so no matter, you know, if there's something

22  remotely sitting out there that could be brought against her,

23  I -- she wants it released.  And quite frankly, I -- I

24  thought it was a reasonable request considering all the

25  ligation in the case and the history of it.  And it's part of

1  the reason why I was okay with it.

2          THE COURT:  What -- what are the Hazan releasees,

3  such as, Selective and Quebec, what are they contributing for

4  the releases?

5          THE WITNESS:  Well, they're not contributing any

6  money, obviously.  They're -- I guess, I don't know, Your

7  Honor.  I don't know the answer to that.  They're -- they're

8  getting -- I guess by Ms. Hazan getting released, in essence,

9  that gives them some kind of, you know, benefit or -- or

10  comfort.

11          MR. HARRIS:  Your Honor, if I may supplement

12  that -- just for clarity's sake.  This case, while there are

13  separate entities and individuals, it really is extremely

14  intertwined in such a case there are, you know, where we're

15  not necessarily, you know, seeking individual contributions

16  but rather a collectively contribution.  And we don't know,

17  you know, what kind of negotiations happened with respect to

18  Hazan and the other release parties.  For our purposes, the

19  total sum of money was the greatest concern, and this was a

20  demand that was made by Ms. Hazan in order to get this deal

21  done.  So it -- there's context involved in these third

22  parties.  They're not just standalone third parties.

23          THE COURT:  What -- do you know the current status

24  of the sale of the property?

25          THE WITNESS:  I don't, Your Honor.  Other than the

1  fact that they've lower the asking price.

2              THE COURT:  Okay.  Okay.  I don't have any other

3  questions for the witness.

4              MR. KOSACHUK:  Your Honor, if I may.  It's not so

5  much a question for Mr. Giuliano, it's a statement for the

6  Court.  I want to make sure the Court is aware that based on

7  what I've just heard, and Mr. Giuliano is testifying that

8  approximately $75,000 will be paid to the nonadministrative

9  creditors, which represents approximately a 1 percent

10 recovery.

11             THE COURT:  Okay.  You'll get an opportunity to

12 argue.

13             MR. KOSACHUK:  Okay.

14             THE COURT:  You absolutely will get an opportunity

15 to argue.  Is there anything further for this witness with

16 respect to rebuttal?  Okay.

17             MR. HARRIS:  Nothing further.

18             THE COURT:  Thank you, Mr. Giuliano, you may be

19 seated.

20             THE WITNESS:  Thank you, Your Honor.

21             MR. HARRIS:  Your Honor, I'm going to keep it

22 relatively brief here because I really do believe that the

23 record speaks for itself.  But let me just say that the

24 trustee is certainly sympathetic to Mr. Kosachuk in terms of

25 the underlying facts that occurred over 12 years.  But we are

1  where we are today.  And we are where we are because of the

2  decisions that Mr. Kosachuk has made throughout the course of

3  this ligation.  Whether that be removing the case from where

4  property was located in stay court to District Court or

5  whether that be putting his own company into an involuntary

6  case and then complaining about the trustee acting on behalf

7  of that entity in accordance with his own fiduciary duties.

8  The bottom line is that our hands are tied.  And they're tied

9  by numerous decisions by courts throughout the country,

10  again, including the Second Circuit, the Eleventh Circuit,

11  various district courts, various state courts.  There has to

12  be an end to this at some point.

13          And if this agreement does not get entered, there

14  is no telling how long -- how much longer this will really

15  go.  And again, Mr. Kosachuk complains that the merits have

16  never been decided on this.  By as the Second Circuit or as

17  the district court in New York has said, it's largely his

18  fault for that.  At a certain point, you can't -- we can't

19  keep giving him bite after bite after bite of the same apple.

20  There is law, and there is equity, but there is law here that

21  is -- that is beyond dispute, and the Trustee and his

22  professionals have worked extremely hard to get a very

23  favorable result that, quite honestly, many other parties

24  involved in this case never thought would be possible.

25          We did contact the other two creditors in this

44

1    case.  This is really a case of four different creditors.

2    The other two creditors, one fully supports, the other does

3    not take a position but understands the practicality of the

4    situation.

5           Your Honor, we have an obligation to maximize the

6    estate.  We are not obligated to act as a personal lawyer for

7    an individual who has lost time and time again, state and

8    federal court, is now trying to use this Court and the

9    Trustee as his own personal forum to continue his personal

10   vendetta against an individual.

11          Again, we are where we are today -- and had this

12   been years ago, things might be very different.  But they're

13   not.  We are 12 years after the fact here, 12 years, millions

14   of dollars spent in legal fees.  One of the parties is being

15   held in contempt.  There's a Chapter 11 case that's been

16   going on for five years.  This is the end.  This is the end

17   of the road.

18          And quite honestly, I've had conversations with

19   Mr. Kosachuk early on in this case, where I indicated that

20   there is a very real possibility that this gets settled.  And

21   in fact, numbers were thrown around that are very close to

22   the numbers that we're agreeing to today.  And we certainly

23   did not hear the pushback that we're hearing today.

24          THE COURT:  Let me ask you a question.  Why is the

25   agreement solely with Ms. Hazan?

1          MR. HARRIS:  Your Honor, Ms. Hazan has been the

2  quasi leader of this enterprise of organizations and

3  individuals.  They are interrelated.  They are all subject to

4  the same claims that Mr. Kosachuk is making, that NLG made

5  pre-petition.  And she took the lead in settling these

6  claims.

7          She's largely implicated, primarily implicated,

8  and from our perspective, distinguishing between the Parties

9  was not a useful exercise in this case, maximizing estate

10  value was.  And when we got an offer that we believed was a

11  very, very good offer.  The source of the funds being Ms.

12  Hazan was not something that we would push back against in

13  order to maximize estate value.

14          Your Honor, the -- the standard here is the lowest

15  standard of reasonableness so long as the Trustee exercises

16  his business judgment under that standard, and this agreement

17  certainly reflects the satisfaction of that standard.  One,

18  the merits of this of this case, as we've heard, and as I'm

19  sure the Court has read, are slim to none.  The complexity of

20  this case speaks for itself.  Again, 12 years, multi-

21  jurisdictional.  The costs?  There are millions of dollars of

22  claims in this case alone for attorneys' fees, doing exactly

23  what Mr. Kosachuk wants us to do now.  The interest of the

24  Creditors is best suited by coming to this agreement and

25  closing this case for good.

1          Otherwise, I have full reason to believe that this
2   court is going to be burden by this case for the next -- who
3   knows.  And it's inappropriate.  And I believe that all this
4   Court has to do is look at the other opinions that have been
5   entered in this case.  Other courts have had the same, exact
6   issues in front of them.  Whether that be state court,
7   whether that be federal court, appellate courts, and even
8   more than that, Your Honor, she has -- Ms. Hazan has a
9   Chapter 11 confirmed plan that expressly incorporates his --
10  Judge Crystal's decision to disallow NLG's claim, and
11  includes injunction provisions that prevents anybody,
12  including NLG, from pursuing those pre-petition claims
13  against her, or her property.
14          THE COURT:  In fact, she probably does not need
15  the release in this settling.
16          MR. HARRIS:  Your Honor, she probably does not.
17          THE COURT:  What is Ms. Hazan's relationship to
18  the other Hazan releasees?
19          MR. HARRIS:  So the other Hazan releasees are --
20  include some corporate entities, one of which held the actual
21  confession of judgment.  Another was an assignee of the
22  confession of judgment.  And then Mr. Meehan is -- my
23  understanding was the president of Selective.  I -- I guess
24  they are -- they were married, since divorced.  And then Mr.
25  Morzak (phonetic) was Ms. Hazan's attorney representing her

1 | in those transactions.

2 |        THE COURT:  The agreement provides -- has a

3 | turnover provision?

4 |        MR. HARRIS:  That's correct, Your Honor.

5 |        THE COURT:  Is -- does the Trustee think there are

6 | any assets to be turned over?

7 |        MR. HARRIS:  No, Your Honor.  This was -- this was

8 | a request made by Ms. Hazan, and I believe it was targeted at

9 | certain documents that may be held by Mr. Kosachuk that he

10 | has not voluntarily turned over throughout the course of

11 | earlier proceedings, including the -- the bankruptcy case.

12 | As -- as Your Honor knows, there -- there will be some

13 | dismissals of cases here, and there is an -- an attached

14 | affidavit that will assist Ms. Hazan in getting a lot of

15 | these cases resolved.  And so we wanted to make sure that we

16 | had the necessary underlying documents and tools to -- to

17 | help her out to do that.

18 |        THE COURT:  There's also a dissolution provision.

19 | To the extent that exceeds this Court's authority, what is

20 | the Trustee's position on that?

21 |        MR. HARRIS:  Your Honor, we have looked into that

22 | issue.  We do believe that there is case law that supports

23 | the Trustee's ability to do so.  And I think, analogously,

24 | you can look at a lot of different orders that are entered in

25 | bankruptcy cases in general, including sale orders that

48

1  require government entities to accept certain documents.  And
2  I think the same goes for Chapter 11 confirmed plans, where
3  regulatory agencies are specifically directed to work with
4  the particular Debtor.
5          THE COURT:  Doesn't it require under Delaware
6  State law that the tax returns are franchise tax and a
7  certificate of dissolution?
8          MR. HARRIS:  I think under state law that -- that
9  may be accurate, Your Honor.  And to the extent that we have
10 to do that, we -- we will do that.  But I think that the --
11 the ask here was consistent with what we've seen in other
12 cases, where you know, sometimes even taxes aren't even
13 required to be paid in order to wind down the estate, not
14 that there would be any taxes associated with this --
15         THE COURT:  Okay.
16         MR. HARRIS:  -- but that was kind of the thought
17 process.
18         THE COURT:  Okay.  Is there anything further?
19         MR. HARRIS:  Nothing further from me, Your Honor.
20         THE COURT:  Do -- Mr. Kosachuk, do you want Mr.
21 Ramirez to go next?  Since he was getting ready to get all
22 the plans?
23         MR. KOSACHUK:  That's -- that's fine by me, Your
24 Honor.
25         THE COURT:  Mr. Ramirez?

49

1          MR. RAMIREZ:  He was here, judge.  I -- I just --
2     I want to just wait one --
3               (Overlapping voices.)
4          MR. RAMIREZ:  -- and I'll let Mr. Kosachuk address
5     everything else, but we have -- a -- the Chapter 11 in court
6     as -- as has been mentioned by Ms. Hazan.  That is a very
7     questionable proceeding because she has not paid anybody
8     after the confirmation was approved, including the IRS, we
9     filed a motion to dismiss the -- the bankruptcy, in which
10    case, if it's granted, the mortgage that we hold against the
11    property would be reinstated.  That -- that motion was
12    withdrawn by the IRS, but because she promised to pay, and of
13    course she hasn't paid, and the IRS may re-file that again.
14    And if that is granted, you know, we would be back with $7-9
15    million judgment instead of 200 -- well, actually, $75,000
16    for us.  And that's the reason we are still litigating this.
17          I do have a pending appeal in -- in New York --
18          THE COURT:  Wait.  One question, Mr. Ramirez.
19          MR. RAMIREZ:  Yes, ma'am.
20          THE COURT:  At this juncture, based on the Florida
21    court -- bankruptcy court decision there is no lien on the
22    property by NLG: is that correct?
23          MR. RAMIREZ:  That is correct.  I -- we do have
24    with this appeal -- appeal pending -- well, there is no
25    statute of limitations on --

1            THE COURT:  Well, the appeal and --

2            MR. RAMIREZ:  -- on the (inaudible).

3            THE COURT:  Mr. Ramirez, the appeal you're

4  speaking to, and if I -- I'm sorry to interrupt you, but I

5  want to make sure that we're talking about the same thing.

6  That is the appeal Ramirez versus Selective; is that correct?

7            MR. RAMIREZ:  That is correct.

8            THE COURT:  That is in the name of yourself

9  (inaudible).

10            MR. RAMIREZ:  Correct.  That's a Creditor of -- of

11  NLG.  I filed that in New York (inaudible).  A Creditor can

12  attack a judgment by confession.

13            THE COURT:  Mr. Ramirez, you're on mute.  I can't

14  hear you.

15            MR. RAMIREZ:  No, I'm -- I'm through because there

16  are announcements going on.  I put myself on mute.  Thank

17  you.

18            THE COURT:  You're concluded, sir?  I'm having

19  trouble hearing you.  I want make sure you are concluded

20  your --

21            MR. RAMIREZ:  No, no.  There -- there are

22  announcements being made --

23            THE COURT:  Oh.

24            MR. RAMIREZ:  -- so I put myself on mute.  And

25  I'll let Mr. Kosachuk address everything else.  Thank you.

1           THE COURT:  Okay.  Thank you, sir.

2           Mr. Kosachuk?

3           MR. KOSACHUK:  Sorry, Your Honor.  I didn't

4   realize you were giving me the podium back.

5           The primary purpose of bankruptcy is to relieve

6   the Debtor from the burden of indebtedness.  I'm quoting from

7   Perez v. Campbell, 402 US 637648, 1971.  Also pending before

8   this Court is exactly that.  A very simple one-count

9   complaint to relieve NLG of this burden of indebtedness

10  caused by this judgment by confession.

11          Counsel for the Trustee went to great lengths to

12  say that there is a procedural knot that simply can't be

13  undone.  That may -- may be his position.  I don't believe

14  that's the case.  I believe this Court holds the linchpin, or

15  the New York State Court, either of which would -- well,

16  there's a third -- that would lead to the same the result.

17          I'm going to touch on what Mr. Ramirez brought

18  into, which is Ms. Hazan's confirmed bankruptcy plan is in

19  default for failure to maintain the plan payments.  She's

20  defaulted on her plan payments to the IRS, to JPMorgan Chase

21  Bank, to Valencia Estates, to Fisher Island.  She's defaulted

22  on every plan payment that she's had to make since 2018.  So

23  based on her inability to honor her own plan, I don't see her

24  honoring this $225,000 payment to the Trustee ever.  It's

25  simply not going to happen.

1           I would also point out to the Court that Quebec,

2    the entity 91975904 Quebec Inc., the holder of this judgment

3    by confession is also my judgment Debtor pursuant to Judge

4    Fitzsimmons's final judgment in my favor for approximately

5    $1.2 million.  So the problem also ensues with these releases

6    that Your Honor touched on.  Ms. Hazan is then going to try

7    to use that release to say that I'm not entitled to collect

8    my $1.2 million, which was also unpaid.

9           Hazan's payment -- as I said, the IRS is intending

10   to file a motion to dismiss Ms. Hazan's bankruptcy.  I've

11   spoken with the United States Attorney's Office for the

12   Southern District of Florida.  And Ms. Hazan has defaulted on

13   her payments to the IRS.  The effect of that, as the Court is

14   well aware, Section 349 of the Bankruptcy Code restores the

15   Creditors to their pre-petition status by operation of law.

16   So when Ms. Hazan's bankruptcy is dismissed, NLG's final

17   judgment of foreclosure is, by operation of law, reinstated.

18   Immediately.  And that would result in millions of dollars

19   available to pay all the Creditors.

20          So I'm not asking Mr. Harris to do anything, to be

21   quite honest with you.  And I've offered to pay the Creditors

22   that have not objected to this, which are two -- it's America

23   Asset Management, which is another Hazan entity, and

24   something called Grove Resolutions.  Those two Creditors have

25   filed -- each filed a proof of claim.  Each proof of claim is

1 │ under $50,000.  Andy they're -- so their two claims about

2 │ $100,000.  They're going to receive approximately $1,000.

3 │ And to the extent that the Court would like to approve this

4 │ settlement agreement, I would like the opportunity to square

5 │ those Creditors up right now.  I will pay them immediately,

6 │ so they're not harmed by this at all.  And then Attorney

7 │ Ramirez and I are left with -- with this matter.

8 │        I also have a pending motion to convert this case

9 │ from a 7 to an 11.  So -- so that's been pending since

10 │ August, and the Court has never ruled on that.

11 │        THE COURT:  Mr. Kosachuk, my recollection from

12 │ looking at the docket, and we spoke about this at the last

13 │ hearing, was that the filing fee was never paid with respect

14 │ to that conversion motion.  Are you telling me that that fee

15 │ has since been paid?

16 │        MR. KOSACHUK:  I -- I can pay it today.

17 │ Literally, I can walk in, and do it right now.  I -- as Your

18 │ Honor knows --

19 │        THE COURT:  Well, the motion is not pending before

20 │ me today.  And has not been pending for -- before me because

21 │ there was a deficiency notice issued by our clerk's office

22 │ because there is a fee associated with that motion.

23 │        MR. KOSACHUK:  And I will make sure that the fee

24 │ is paid today, Your Honor, so that that can move forward.

25 │        So to the extent that the Court wants to proceed

54

1  with it -- I would tell the Court that this settlement is

2  wholly insufficient.  Period.  It's void for lack of

3  consideration, as Your Honor correctly touched on.  Ms. Hazan

4  is settling a case that she's not a party to.  The Trustee

5  hasn't spoken to the manager of Selective Advisors.  Or

6  anybody for Selective Advisors, other than Hazan, who has

7  carefully avoided ever being a manager or any formal

8  corporate person in that entity because they play these shell

9  games.

10        So I think it's rather -- I don't think the Court

11  can approve a settlement with a nonparty to resolve this

12  adversary over a promise to pay from someone who has a

13  20-year history of nonpayment.  NLG is in the position

14  because of Hazan's nonpayment.  So if they were actually

15  getting money now, it would be a completely different story.

16        The other issue is that this judgment by

17  confession is, indeed, void on its face as a matter of law.

18  At some point, the New York State Court, who is the proper

19  venue and court to do this, will do what they've already

20  done.  And in Mr. Ramirez's objection, that New York State

21  Court has -- and I'll read it.  It says ordered and declared

22  that the judgment by confession for $5,000,225 in the case

23  caption as 91975904 Quebec Inc. versus NLG entered under

24  Index Number 101875-2012 in the Supreme Court of New York,

25  New York County, on February 22, 2012, and assigned to

1 Selective Advisor's Group on June 17, 2014, is void ab
2 initio, and hereby vacated, set aside, and stricken from the
3 public records nunc pro tunc to date of entry as it was
4 entered without jurisdiction, without service of process,
5 without any due process, and collusive as the affidavit
6 confessing the judgment was signed by the president of the
7 Plaintiff corporation.  That's the order that Mr. Ramirez was
8 referring to as now subject to an appeal in the First
9 Department.

10         Mr. Harris also quoted first -- a Second
11 Department case law, and I'm not sure how familiar this Court
12 is with the way New York operates, but New York is divided
13 into judicial departments.  The First Department is New York
14 County, and that's what the judgment by confession is.  Mr.
15 Harris, and his paperwork has quoted Second Department case
16 law, which is not binding on First Department.  New York
17 makes this very, very complicated.

18         However, New York is also clear that the judgment
19 by confession statute allows no confession of judgment on a
20 tort claim.  So while it has been a long time -- I do
21 appreciate that this has been 12 years.  I do appreciate that
22 Ms. Hazan has lived fabulously the high life in Fisher Island
23 for 15 years for free by not paying the Creditors.  And all
24 the settlement will do is ratify her bad behavior and reward
25 her for defrauding all of her Creditors.  That's not a great

1  outcome.  It's actually a terrible outcome.

2          And as I said, to the extent that the Court even

3  wants to consider this, I would ask for the opportunity to

4  pay off the two Creditors that have accepted this settlement

5  right now, and then I would work with Trustee Giuliano, and

6  whatever fees are owed to Mr. Harris' firm, I'd like to

7  resolve those, too.  And get this out of the way because this

8  is not a good outcome for the Creditors.  They're trading a

9  $9.5 million secured claim for a promise to pay for $225,000

10  from someone who never pays.

11          THE COURT:  Mr. Kosachuk, what is your

12  understanding of the value -- the amount of liens on this

13  property?

14          MR. KOSACHUK:  $9.5 million to NLG; $7 million to

15  JPMorgan Chase Bank; $5 million to an entity called 6913

16  Valencia, LLC, which is Hazan; then there's 800,000 to the

17  Fisher Island Community Association; there's 100 and I think

18  it's 61 thousand to the Valencia Homeowners Association; and

19  then there's approximately $500,000 to the IRS for failure to

20  pay income taxes since 2002.  So if we add those numbers up,

21  it exceeds the current ask of $21.8 million of the property.

22          And so the $225,000 that they're proposing, and

23  they think can be recorded would be behind all that, but I

24  direct the Court to the Florida Homestead, which is

25  guaranteed in the Florida Constitution.  I've cited it in my

1  papers, and this enables someone like Ms. Hazan, who is a

2  very sophisticated professional Debtor.  She borrows money,

3  and she never pays.  She makes promises and never pays.  And

4  this agreement will be the exact same.

5             THE COURT:  Mister --

6             MR. KOSACHUK:  Thank you, Your Honor.

7             THE COURT:  -- Mr. Kosachuk, attached as Exhibit 1

8  to Mr. Ramirez's objection is this judgment default dated

9  February 11, 2021; what is the status of that?

10             MR. KOSACHUK:  That's pending on appeal before the

11  First Department --

12             THE COURT:  Right.

13             MR. KOSACHUK:  -- which is going to adjudicate the

14  matter.  I believe it's November -- in November of this year.

15  I believe it's the 25th.

16             THE COURT:  Okay.  There's argument?

17             MR. KOSACHUK:  Yes.  I believe it's scheduled for

18  oral argument.

19             THE COURT:  Okay.  Thank you.

20             MR. KOSACHUK:  Thank you, Your Honor.

21             MR. HARRIS:  Your Honor, very briefly just to

22  address a couple points?

23             THE COURT:  Yes.

24             MR. HARRIS:  First of all, with respect to the

25  releases, it's very clear that they're derivative claims that

58

1    are being released, not direct claims, and so to the extent

2    that anybody has a direct claim that would not fall under the

3    bar order.

4          THE COURT:  So that, to the extent that Mr.

5    Kosachuk has it -- a judgment against Quebec, he has the

6    ability to pursue.

7          MR. HARRIS:  A personal, direct claim.  Yes, Your

8    Honor.

9          Second, the offer that we received from Mr.

10   Kosachuk was essentially $1,800.  I just want clear that for

11   the record.  And finally, when laying out the liens on the

12   property, Mr. Kosachuk included a $9 million lien that's held

13   by NLG.  Obviously, that is not true, and --

14         THE COURT:  What's the Trustee's position about

15   what the estimated lien amount on the property is?

16         MR. HARRIS:  We believe it's lower than what Mr.

17   Kosachuk has represented, not only just on the NLG part, but

18   on some of the other portions.  I -- I can't stand here and

19   tell you precise numbers.  There's accruals happening, and

20   there's a lot of moving parts there.  But even if you do take

21   his representations, and his numbers, less the NLG, there's

22   significant equity in the property based on the purchase

23   price that's -- that's up for sale.

24         And just so Your Honor is aware, she has hired

25   real estate agents to sell the property, two different firms,

1   and we -- we do know that she is actively pursuing a

2   refinance.  We have seen confidential documents reflecting

3   that.  Of course, you know, there are some issues associated

4   with that given these cases, but we have done our due

5   diligence in terms of ensuring that our lien is as protected

6   as it can be in this case.  That's all I have, Your Honor.

7           THE COURT:  Thank you.  Could we take -- I'd like

8   to take a ten-minute recess, and we'll reconvene.  So let's

9   just reconvene at noon.  Thank you.

10          (Off the record at 11:51 a.m.)

11          (On the record at 12:05 p.m.)

12          THE COURTROOM DEPUTY:  All rise.

13          THE COURT:  Please be seated.  I have a few

14  follow-up questions that's for the Trustee.

15          MR. HARRIS:  Sure, Your Honor.

16          THE COURT:  First of all, can you explain to me

17  who were the noticed parties for the motion?  Did the Hazan

18  releasees get notice?

19          MR. HARRIS:  Your Honor, My understanding is that

20  they have received notice.  I would have to look at the

21  certificate of service to identify specifically whether they

22  individually got it, but I know that they do have actual

23  notice through Ms. Hazan.

24          THE COURT:  Okay.  So in the motion, the Trustee

25  indicates that he's reviewed hundreds of records, and

1  filings, and -- Trustee, or Trustee's counsel -- hundreds of

2  records, and filings, discussion with various interested

3  Parties, including Mr. Kosachuk, counsel for Ms. Hazan, Ms.

4  Hazan, and counsel for the related shell companies.

5        MR. HARRIS:  That would be Ms. Klein -- Julia

6  Klein, who has appeared before today.  They're all -- there

7  are also other attorneys that have been involved, not

8  necessarily in Delaware, but in Florida -- Jeffery Aaronson

9  (phonetic).  I've spoken with -- there's another gentleman --

10 Joe -- Joe Grant, I believe we've been in touch with as well.

11       THE COURT:  Okay.  And -- and whose interest do

12 they represent?

13       MR. HARRIS:  So Ms. Klein represents the

14 Defendant, Selective --

15       THE COURT:  Selective.

16       MR. HARRIS:  -- Advisors.  Ms. Hazan is personally

17 represented is my understanding, but she had advised her

18 counsel at a certain point in the negotiations that she would

19 prefer to lead them herself.

20       THE COURT:  Okay.

21       MR. HARRIS:  Counsel was copied -- her counsel was

22 copied on -- on our correspondence.  But I did have direct

23 communications with her, as she asked, and as I was granted

24 access to by her counsel.  So I -- I would say -- I would say

25 that those are the Parties.

1          THE COURT:  Okay.  And in the event the Court were

2   to approve this settlement, is Selective in a position that

3   it would execute a stipulation of dismissal?

4          MR. HARRIS:  I'm -- I'm -- I'm sure they would,

5   Your Honor.  I can't -- I can't make the representation for

6   them, but part of this is getting it resolved, so I'm sure

7   they would be happy to do so.

8          THE COURT:  Okay.

9          MR. HARRIS:  And I did ask counsel to be here for

10  Selective before the hearing.

11         THE COURT:  I'm just seeing if counsel for

12  Selective is in here.

13         MALE VOICE:  Ms. Klein.

14         THE COURT:  Okay.  And let me ask, is Mr. Meehan

15  on, too?  Or is Ms. Klein on Zoom?  I see that Mr. Meehan is

16  registered for Zoom.  Okay.

17         Well, thank you very much for your arguments

18  today.  I'm going to take this matter under advisement.  Are

19  there any questions before we conclude, or any housekeeping

20  matters?

21         MR. HARRIS:  Yes.  The -- the one housekeeping

22  matter would be, you know, the abeyance technically, I think,

23  ended in this case while this was pending.  And you know, I

24  guess my other concern is the -- the -- the longer that --

25  well, let's just say -- let's just say that we probably

1  should deal with how that's going to proceed, and then I

2  guess, also the motion to convert if that's going to move

3  forward.  But I guess we can address that whenever the filing

4  fee gets paid.

5          MR. KOSACHUK:  Your Honor, if I may, the filing

6  fee's been paid.

7          THE COURT:  Okay.

8          MR. KOSACHUK:  I have the receipt, if the Court

9  would like to see it?

10          THE COURT:  No.  I -- well --

11          MR. HARRIS:  Your Honor, if I may make a

12  recommendation, maybe we hold these matters?

13          THE COURT:  Yeah.  I -- I -- there's also a motion

14  to extend the deadline to respond to answer a complaint.

15  It -- it seems to me it would be prudent to hold these

16  matters in abeyance pending the Court's ruling on this

17  motion; does anyone object to that?  Or would anyone like to

18  be heard with respect to that?

19          MR. KOSACHUK:  Yes, Your Honor.  I -- I assume

20  you're referring to the adversary that I filed?

21          THE COURT:  Yes.

22          MR. KOSACHUK:  The one count?

23          THE COURT:  Can -- yeah.  Can you, please, make --

24          MR. KOSACHUK:  Sure.

25          THE COURT:  -- it to the podium so -- so we can

63

1  hear you and record you?

2              MR. KOSACHUK:  Absolutely, Your Honor.  That's my

3  adversary that I filed.  It's a one count complaint seeking

4  for this Court to strike the indebtedness nunc pro tunc to

5  February 22, 2012, that was caused by this judgment by

6  confession.

7              THE COURT:  But --

8              MR. KOSACHUK:  This is --

9              THE COURT:  -- that's the same relief that's being

10  sought by Mr. Ramirez's action in New York that's being

11  scheduled for argument on November?

12             MR. KOSACHUK:  No, Your Honor.  It's slightly

13  different.  What I have invoked -- the Bankruptcy Section 105

14  the inherent powers of the court.  And as I had quoted the

15  case of -- that this Court, the purpose of bankruptcy is to

16  relieve a Debtor of -- sorry, the burden of indebtedness.  So

17  what's before this Court is asking the Court to strike the

18  indebtedness.  It's not asking this Court strike or vacate

19  the judgment itself.

20             What Mr. Ramirez has pending in New York is a

21  separate action, asking the New York State Court to vacate,

22  strike, and set aside the same judgment.  While the end

23  relief is the same, effectively, it's two different issues

24  because obviously this -- the -- this Court would have the

25  authority to strike the indebtedness, and I guess what's been

1  called into question is whether this Court has the authority

2  to strike the judgment itself.

3          THE COURT:  Okay.

4          MR. KOSACHUK:  And as for Ms. Klein's request for

5  an extension of time, this is precisely why this case has

6  been dragging on for 12 years.  Because every time Ms. Hazan,

7  or one of her entities has something to do, they seek an

8  extension of time.  And every -- and every case -- they did

9  this to Mr. Ramirez recently, and that's why his case was

10  filed back in 2020.  So over two years ago, it's been pending

11  up in New York, way before NLG was in bankruptcy.

12          So at a minimum, I think what the Court should do

13  is allow the -- Mr. Ramirez's New York action to play out.

14  Because if Mr. Ramirez is successful, there won't really be

15  anything for this Court to do because the judge --

16          THE COURT:  Well, Mr. Ramirez's action is not

17  before me, Mr. Kosachuk.

18          MR. KOSACHUK:  That's correct.

19          THE COURT:  And furthermore, that action does

20  not -- if I recall correctly, that is not captioned related

21  to NLG.

22          MR. KOSACHUK:  Your Honor, the -- that has to do

23  with New York CPLR 3218.  And what that is, is the judgment

24  by confession statute for New York, which enables anybody,

25  including the judgment Debtor, who's been harmed by the

1  judgment, to challenge it through a separate plenary action.

2  And that's what Mr. Ramirez has done.  He has filed a

3  complaint in his own name against Selective Advisors Group,

4  challenging the validity, or should I say the void nature of

5  the judgment by confession.

6          And I think as the Court would probably be aware,

7  a void judgment has no statute of limitations on its

8  challenge because it's a legal nullity.  It acquires none of

9  the characteristics of a valid judgment, and as the wine

10 analogy goes, it doesn't get better with time.  So if it was

11 void on Day 1, it's still void now, and it is always subject

12 to collateral attack.

13         THE COURT:  Okay.  Well, because I'm going to be

14 ruling on this motion, and because of what has -- what is

15 transpiring now, in this case, I am going to provide a short

16 extension because, in fact, there was a stay for a period of

17 time, and I think it led to confusion as to when, and whether

18 a response was even due in light of the pending stay.  So I

19 am going to be granting a sort extension.

20         MR. KOSACHUK:  No problem, Your Honor.

21         THE COURT:  Okay.  Is there anything further, Mr.

22 Kosachuk?

23         MR. KOSACHUK:  The only other piece of evidence

24 that I would like to proffer in would just be -- unless

25 there's going to be a challenge to it -- that Ms. Hazan and

1  Mr. Meehan are divorced, and nobody here has actually

2  contacted Mr. Meehan, who's the manager of Selective, about

3  any of this.  So I think Your Honor, touched --

4          THE COURT:  Um-hum.

5          MR. KOSACHUK:  -- on to something very valuable,

6  which is we don't know for sure if Mr. Meehan even knows

7  about this.

8          THE COURT:  Well, Mr. Meehan is -- let me just

9  state on the record that Mr. Meehan is registered for today's

10 hearing.  I don't know if he was on early, or not, but he was

11 registered.

12         MR. HARRIS:  Your Honor, he's also represented by

13 counsel through Select Group's counsel.  So it would actually

14 be improper for us to be contacting him individually without

15 his attorney's consent.

16         THE COURT:  Okay.

17         MR. KOSACHUK:  Well, but counsel for Selective

18 didn't show up either.

19         THE COURT:  Okay.  All right.  Well, thank you,

20 all.  We stand adjourned, and the Court will be issuing a

21 ruling forthcoming.  Thank you.

22

23     (Proceedings concluded at 12:15 p.m.)

24

25

67

1                          CERTIFICATION
2              We certify that the foregoing is a correct
3    transcript from the electronic sound recording of the
4    proceedings in the above-entitled matter to the best of our
5    knowledge and ability.
6
7    /s/ Wendy Sawyer                        November 10, 2022
8    Certified Court Transcriptionist
9    For Reliable
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25